Next case is Country Mutual Insurance v. Hilltop View LLC. Who's going to be arguing for the appellant? I am, Your Honor. My name is Charles Fadden. I represent Country Mutual. And for the appellant, Ms. Martin? You may proceed. May it please the Court, Charles Fadden representing Country Mutual. I hope to focus my argument today on two main points. The first one is why the odor claims at issue in this case involve traditional environmental pollution. And that is a mouthful as well. And I'm going to refer to that as TEP, save nine syllables in the process. The second point is why the Imperial Marble case that the Circuit Court relied on is not controlling of this case. Now, with respect to traditional environmental pollution or TEP, we have to begin with the Columns case. And that was the Supreme Court's case in which they held that the absolute pollution exclusion was enforceable, is enforceable, and is not ambiguous if and only if the claims involve traditional environmental pollution. Now, it didn't define TEP. But several cases since that time in the appellate court have referred to TEP as being hazardous materials that have been discharged into the environment beyond the insurer's premises. That's the Kim case, the Luke recycling case, and the Village of Crestwood case, all in the state appellate courts. The insurers don't dispute that this went beyond the premises. But they do strongly dispute that this was hazardous materials. So let me address that. Now, the term hazardous materials doesn't come from the policy language. It comes from the gloss that the Supreme Court put on it in Columns when looking at the absolute pollution exclusion. So it's not a defined term in the policy. There's nowhere to look in the policy to understand what that means. So we have to do what courts do in that situation. Even with undefined terms in the policy, they turn to the dictionary. And the dictionary defines hazardous to mean involving or exposing one to risk of loss or harm. And that is exactly what the allegations of the underlying complaint are here. That the foul and obnoxious odors that were produced on a continual basis by the swine factory, as it's called by the underlying claims, that those odors wafted over into their properties, these are neighbors of the facility. And it interfered in a substantial way with their lives. It harmed their lives as they knew them prior to the factory, the swine factory going into operation. They lost the enjoyment of their property. And they even said that they lost money in the form of higher energy bills as a result of having to keep their doors and their windows shut because of the smells from the facility itself. So the allegations satisfy the definition of hazardous. And we believe, because they don't challenge the fact that it went beyond it, that this is traditional environmental pollution. But let's take a step back, because the word is N-T-E-P. The T stands for traditional. So how do we know whether something is traditional or not beyond this definition that we just talked about? And there are a number of indicia that courts have looked at to determine whether something is traditional or not. And one of those, the Cold Creek Compost Court, that's a California case. And California does apply the same traditional environmental pollution standard as Illinois does. We refer to that because that's one of these odor cases. But in looking at that, the court looked to statutes. And if we look to statutes here, the Illinois Environmental Protection Act defines contaminants to include odors. It talks about solid, liquid, gaseous, or odor. Irritants or contaminants and odors. And it defines air pollution to be the presence in the atmosphere of contaminants that substantially interfere with the, among other things, the enjoyment of life or property. So Illinois, the Illinois legislature has said that when odors are in the air in such a fashion to interfere in a substantial way or unreasonably interfere with the enjoyment of life or property, that that constitutes air pollution. So the legislature has made a determination that air pollution is, that odors wafting over and disrupting it in a way that the plaintiffs below claim have happened here, that would be traditional environmental pollution. Have you ever been on a hog farm that didn't stink? I'm sure that all, I've been on one hog farm, but I'm sure that they all do. But the fact that something is supposed to stink, there are odor control methods that are supposed to be in place. And there are numerous cases, Your Honor, where the, either the EPA or citizens have brought suit against hog farms. In Illinois, for example, that the, they've taken this case to the Pollution Control Board and they have found them to be in violation of the section of the Illinois Environmental Protection Act that discusses air pollution. So the fact that it does stink is not the problem. That is considered, it's still considered air pollution. There are cases that the PCB has cited. There's even a case, this is a, this was a chicken farm as opposed to a hog farm, but it was essentially the same thing, manure and incineration of dead chickens, just like there's manure and incineration of dead hogs in our case here. And the Illinois Supreme Court, in a case going back to 1976, said that approved a fine and a cease and desist order by the Illinois Pollution Control Board in finding that that was air pollution. And a steel mill, they know that there is smoke that's going to come out of those smokestacks all the time, but you still have a responsibility to control it. And it really doesn't matter if the underlying plaintiffs are right about whether this is affecting them or not. It's the fact that they've alleged it and it's the kind of traditional environmental pollution that the state regulates and looks at. But they haven't alleged that they've been physically harmed by it. They don't have to allege that, Your Honor. The pollution exclusion in the umbrella policy applies not only to physical injury in the form of bodily injury. It talks about bodily injury and property damage. So that the coverage here would be for property damage. Of course, there's been no contamination from their property, physical contamination of the neighboring property. It's simply the smell. So in other words, no manure from that property is passing over to the property of the… Only in the gaseous form. The physical, the solid and liquid form it hasn't, but as a gas it has. And certainly air pollution isn't necessarily, is one of the kinds of pollution that exists. In the Columns case, when the Supreme Court was imposing the traditional environmental pollution requirement, it looked to the fact that the Clean Air Act had recently been enacted and said that was one of the reasons that the pollution exclusion was adopted. So air pollution is certainly one of those. Now the fact that it's property damage versus bodily injury, if it were bodily injury, there's no claim for bodily injury in that suit. I acknowledge that. If that were the case, the company could have denied on the fact that there's no claim for bodily injury. If that's the only thing… I guess what I'm getting at is there's no physical property damage. It's the loss of enjoyment of the property. Which is what Illinois defines to be air pollution in the Illinois Environmental Protection Act. And what the courts, what the Pollution Control Board has said is air pollution, and what the Illinois Supreme Court has said in that chicken farm case. The Land Management Facilities Act is another statute, and that does address animal waste and odors. And it talks about having odor control, and it says if it isn't done right that this can lead to air pollution and agricultural pollution problems. So that statute also recognizes the fact that this is a traditional form of pollution. For purposes of the coverage case, insurance coverage case, it doesn't matter whether the plaintiffs are right about being affected or not. It just matters that they alleged it, because we have to take the complaint allegations as being true. So they're alleging that Hilltop and PSM did not do a good job. They didn't adhere to the standards that they said they were going to adhere to in controlling these odors, and they allowed the odors to come waft over and interfere with their lives, and they've got dollar losses that they're alleging. The Kim case, which was a TEP case, it was a dry cleaner where there was perc involved in this. A new perc was there, just like a hog farm knows that smell was there. But the court said, that's okay, it doesn't matter. In that case, they talked about the lost profits from people having to be closed because of the perc invading their property. So the lost profits there are the equivalent of the lost dollars for higher energy bills for having to shut your windows and your doors and run your air conditioners. This was chemical pollution, right? And this is a chemical that's polluted too. There's allegations in this about ammonia and hydrogen sulfide as being, they are specifically mentioned in the complaint. Those are components of when manure breaks down, that's what's released is ammonia and hydrogen sulfide. They don't say that they were physically injured. There are other hog farm cases where they do say they have a physical injury. The complaint in this case didn't allege it, but it doesn't have to, because property damage, which is defined to mean the loss of use of your property, is also excluded by the pollution exclusion. Now the Illinois, there are also rules and regulations under the Illinois Environmental Protection Act that talk about air pollution, and they talk about animal waste, and they talk about odor control methods. So it's not just the Illinois EPA or the Illinois Land Management Facilities Act, but it's the rules and regulations as well. And the fact of the matter is that another indicator that the cases have looked at, that the Cold Creek case has looked at, is did the state EPA come out and investigate these things? And yes, the state EPA did. They investigated the very odor claims that are at issue here. But it didn't find any pollution. Again, it doesn't matter, because they are alleged that this happened. If a neighbor of a chemical plant had alleged that there was a spill, and they go to trial and it's determined there was no spill, the pollution exclusion would still apply to that spill, because that was a pollutant that is alleged to have happened. So the fact of the matter is, the facts that are determined as to whether there is or isn't an actual pollution violation, that is irrelevant in terms of the duty to defend. You have to look at the allegations of the underlying complaint. And the plaintiffs here, and that case is currently stayed, but it's still an active case saying that they are still contending that there is pollution. That remains to be proved as to whether there is or isn't. In addition to the state agencies investigating it, there's a test that the Seventh Circuit, in applying Illinois law, looked to, and it said, are these odor claims common and are they a fertile source of litigation? Well, at pages 25 and 26 of our brief, we listed ten cases where the underlying claim, or where the claim itself was involving a hog farm and neighbors making these kind of claims. The Pollution Control Board cases are out there, there are numerous of those that are out there that treat this as well. And the insured amici, the pork producers, represented to the court that there was a sufficient number of cases that this was one of the major problems facing their producers nationwide and in the state of Illinois. And indeed, the insureds in this case cited a case, an unpublished case, called Bible Pork. We didn't include it in our list of that because it was unpublished, but they cited that. That's a case that talks about the hog farm pollution. It's the same kind of case as this one. So these are common, they are a fertile source of litigation. So the Seventh Circuit, and the reason that's important is, Colm's court said, well, what are you trying to prevent here with the pollution exclusion? And what they were trying to prevent, they said the predominant motivation for writing the pollution exclusion was to prevent the exposure that comes from all this environmental litigation. So when the Seventh Circuit is looking at that and saying, yeah, is this common, is there a fertile ground for litigation? They're trying to say, what's out there? What are you trying to cut off the exposure for? And that's what the pollution exclusion is. Now, the last point I would make on the TEP part of this is the rules of construction. Now, Colm's itself and many other cases tell us to look at the type of insurance that was purchased and the nature of the risk. Well, the type of insurance that was purchased here was a farm umbrella policy. And you asked about, has there ever been a hog farm where it doesn't smell? This policy was issued for farms. It wasn't issued to a steel mill. It's not the kind of policy that is issued to that. So they're looking at the kind of pollution that occurs on a farm. So that is the kind of pollution that they're worried about there. That's one of the things that the Colm Court tells us to look at in general, not with respect to TEP, but in general. And a very important point here is that there is a pollution liability policy that Country Mutual issued to these insurers. And that policy provides coverage for pollution incidents. It defines, to be a pollution incident, it has to have pollutants. The same definition for pollutants in the pollution liability policy is the definition that's in the pollution exclusion. So the umbrella policy excludes it. The pollution liability policy potentially covers it. Now, you have to still meet the terms and conditions of the pollution liability policy but if you're going to get coverage for a pollution event, that's the place that you would get it. It so happens in this case that that policy is, that's being litigated. And they are contending, even as we sit here today, or I stand and the rest of you sit, that there are pollution incidents that should be covered. They're saying that that is pollution. Now, Columns, one of the other reasons that Columns adopted the traditional environmental pollution requirements is because of the use of the words discharge, dispersal, release, and escape. They said those are terms of art in the pollution world, in the environmental world. Those same terms, or similar terms, are used in the pollution liability policy. So that parallelism between the two of them is just very evident. And in fact, there's a third kind of policy, the AgriPlus policy, that's sort of a ground level policy, this is the umbrella over it. The AgriPlus policy that was issued to them, that's a farm AgriPlus policy, that has a little box on the application that says, I am specifically declining to take the pollution liability coverage. Because this AgriPlus policy with its pollution exclusion says, is basically saying, it's not going to cover certain kinds of pollution, so you may want to get that pollution exclusion. At the time they bought the AgriPlus, they checked it and said, yeah, we understand that we're not buying it. They subsequently bought it. For all of those reasons, this is traditional environmental pollution. I think that, I'm not sure I made any headway, Justice Pope, with you in explaining that the common feature of being pollution matters, but I think that we have to focus on the allegations of the complaint, rather than whether it was actually a pollutant that came over. Has anybody ever defined traditional environmental pollution? I don't think the court did in Collins, did they? The court did not. In Kim, and in the Village of Crestwood case, and in a loop paper recycling, the court says, traditional environmental pollution, comma, IE, or that is, one time they say IE, one time they say that is, hazardous materials, dispersed into the environment beyond the premises of the insurer. So that's the closest we come to an actual definition. And in Collins, they found carbon monoxide was not a traditional environmental pollution, and it didn't disperse beyond the property. Only because it didn't disperse beyond that. There weren't questions... I think they talked about the fact that this was a common chemical, and nobody would think of it as traditional environmental pollution. Well, if you were concerned about causing injuries, carbon monoxide causes death. Right, but that's different than saying it's traditional environmental pollution. Well, it does spread, had it spread beyond the premises in Collins, that would have been found to be traditional environmental pollution. What they were talking about was something that wasn't even remotely, they used the word, it wasn't even remotely related to pollution, or it's not close to pollution. This is, I think the indicators I talked about show that it is. With respect to Imperial Marble, no permit here. The permit in Imperial Marble had a shield, basically a safe harbor, that said if you don't make it up to this level of pollution emissions, we're not going to consider pollution under the federal or state regulations. So that is far different from what we have here. There's no permit in this case, and there's no safe harbor in the LMFA, which is what they say is their equivalent of a permit. But there's nothing, they say at page 19 of their brief, that that is a finding of no hazardous, no TEP there, but there is no such finding. Thank you. You'll have additional time on rebuttal. Ms. Martin. Thank you, Your Honor. My name is Jennifer Martin, and I am here representing Professional Swine Management LLC and Hilltop View LLC, who are country mutuals insurers in this case. They are also defendants in the underlying case, and they are the owner and the operator of the Hilltop View Hog Confinement Facility, which is located in Schuyler County. And I agree with my opposing counsel that the court's focus in this case has to be on the Supreme Court's decision in the Collins case. The Supreme Court spent a significant amount of time in that case going through not only and looking at the history of the pollution exclusion and how it was drafted, but also how courts around the country were interpreting the same pollution exclusion language. And it's significant. One significant thing about that case is that the insurer argued in that case that carbon monoxide and these other furnace fumes that were the subject of the case were pollutants under the definition used in the pollution exclusion because these carbon monoxide and fumes were gaseous irritants and contaminants. And what the insurer tried to argue is that you need to look at dictionary definitions of these terms and commonly understood meanings of these terms in order to apply this definition of pollutants. The Illinois Supreme Court completely rejected that argument. It focused on two decisions that were very concerned with the over-breath of this type of language and this type of application of the definition of pollutants. It noted that it cited the Westchester Fire Insurance case versus City of Pittsburgh, which is a Tenth Circuit case, which said that there is virtually no substance or chemical in existence that would not irritate or damage some person or property. And it also cited the Pipefitters Welfare Education Fund versus Westchester, which was a Seventh Circuit case from 1992, which said that a broad reading of irritant or contaminant could encompass common cleaning products. And the significant thing about the Collins case is that the Collins case clearly focused on the idea of environmental litigation or in the fact that the pollution exclusion was drafted to cover any sort of harms or hazards that arise out of environmental litigation. Country Mutual wants to define hazardous in a way that encompasses any sort of nuisance claim. But the Collins court made a specific finding that the pollution exclusion, as drafted, was directed to environmental litigation, not just any sort of nuisance claim. The cases that the opposing counsel was talking about that involve other types of nuisance claims involving confinement facilities in Illinois, those are nuisance cases. Those are not necessarily, out of the cases he's talked about, they're not environmental litigation cases. And therefore, this idea that they're a fertile source of environmental litigation is not the case. Collins also noted in support of its holding that the drafters of the pollution exclusion used environmental terms of art. And suggested there that this idea that you look to commonly accepted meanings of these terms is not how to interpret the language of the policy. And particularly the term pollutants. And what the Collins court eventually held, and I think, Justice Pope, this kind of gets to your question about this definition of traditional environmental pollution. The Collins court held that the predominant motivation in drafting an exclusion for pollution related injuries was the avoidance of the enormous expense and exposure resulting from the explosion of environmental litigation. So they said that we are not going to apply the bare words of the exclusion to situations which do not remotely resemble traditional environmental pollution. The pollution exclusion has been, and should continue to be, the appropriate means of avoiding the yawning extent of potential liability arising from the gradual or repeated discharge of hazardous substances into the environment. And that's where this discharge of hazardous substances into the environment, that's where this sort of standard or test comes from. It's been applied by Illinois appellate courts in subsequent decisions that apply Collins and look at this pollution exclusion language. One thing, too, I'll note, in this particular case, if we look at the underlying plaintiffs, the odor claims, and they are just simply odor claims. There's nothing relating, as Justice Pope noted, there's nothing related to releases of manure. The only claims here that we're dealing with are odor claims. And the underlying complaint itself contains absolutely no allegation that these odors are hazardous or that they violate, in any way, Illinois environmental statutes or regulations. Our brief and the amicus brief filed by the National Pork Producers Council and the Illinois Pork Producers Association explain that odors from hog production facilities are not hazardous or regulated substances under Illinois or federal environmental laws. And the Livestock Management Facilities Act that my co-counsel referenced in Illinois, which is a statute that's administered by the Department of Agriculture, does recognize the fundamental fact that Justice Pope also recognized, which is that pigs smell. Not only do pigs smell, but the manure from pigs smells. And the Livestock Management Facilities Act is significant because it recognizes that these odors are an expected and a normal component of these hog confinement operations. It also acknowledges, and I think this is pointed out in Country Mutual's brief, that if these hog confinement facilities are not sited, constructed, or operated in a proper manner, there is a potential for odors from these facilities to rise to the level of a pollution problem. But the presumption underlying the Livestock Management Facilities Act in Illinois is that if these facilities are sited, constructed, and operated correctly, the odors will not be a pollution problem and that they're just a normal component of the operations of these facilities. And also that those odors will not be in violation of state law. It can smell, but if it smells too bad, then it's pollution. That's correct. Is there a meter or something you can determine that by? There is not, not at this time in Illinois. And actually there are not odor standards in Illinois. There are in other states, but they have not passed those. How do you measure an odor? Well, and that is why, just to follow up on that, in this case, we do have Illinois EPA that does go out to these facilities, and Illinois EPA has the option of charging these types of facilities with air pollution violations to the extent that they believe. You know, is there, how do you measure that? I mean, you know, you're sending EPA guy A to this farm and EPA guy B to this farm, their noses are going to be different. That's correct, Your Honor. I agree. It is a somewhat subjective application of the standards. Somewhat? But it is what we have in Illinois at this time. And in this case, we have, in Illinois, we have people who called into Illinois EPA and made complaints involving odors from this facility. We have Illinois EPA inspectors who went out to this facility and actually walked around and went to the neighboring properties and who did not make any sort of specific finding of air pollution or any finding of any other violations of environmental laws. And, Your Honor, this goes back to what Collins was talking about. Collins says that the pollution exclusion is directed to environmental litigation. And from the standpoint that we don't have any sort of suggestion of violations of environmental laws or regulations at this facility, the pollution exclusion is not intended to apply to these types of claims. Can you address, before you run out of time, I want you to address the other defenses that were raised but not yet litigated and how could Judge McMillan grant summary judgment with respect to those? Was it Ortfall or McMillan? It was McMillan. It was Justice McMillan. And, Your Honor, the way that the other defenses came up, Country Mutual filed a fourth amended complaint for declaratory judgment that added counts regarding coverage under the umbrella policy. And they did this after they denied or they declared the pollution policies unilaterally rescinded, denied the defense under that. So we went back to Country Mutual and we said, look, since the pollution policy is apparently no longer in effect, please provide a defense under the umbrella policy. And Country Mutual rejected that. They denied a defense under the umbrella policy and then they amended their complaint to add these counts. Now, when they initially issued their denial of coverage under the umbrella policy, the only basis for that denial was the pollution exclusion in the umbrella policy. They subsequently raised these other claims, but then they went ahead and filed a motion. I'm sorry? Through an amended complaint. That's right. And then they filed a motion for partial summary judgment on the umbrella policy and the only issue they raised was the pollution exclusion. They elected, apparently at that time, some strategic decision to not raise these other coverage defenses. We filed a cross motion for partial summary judgment on the pollution exclusion and asked the court to find that Country Mutual had a duty to defend. In response to our cross motion, Country Mutual could have raised these other coverage defenses because we were asking the circuit court to order them to defend and it elected again not to do so. So under Illinois law, as we pointed out to Judge McMillan, Country Mutual is the party with the obligation to seek a declaration of no coverage in this case. And that, Your Honor, the case that I think states that, the most recent case maybe that states that, is the Illinois Supreme Court's decision in State Farm v. Martin, which says when a complaint against the insurer alleges facts within or potentially within the scope of policy coverage, the insurer taking the position that the complaint is not covered by the policy must defend the suit under a reservation right or seek a declaratory judgment that there is no coverage. But isn't that what they did? Well, they sought a declaratory judgment on one of their coverage defenses. They didn't raise all of them. Well, they filed a motion for partial summary judgment. I mean, try the terms of it. They're saying at least this one issue is right for decision on a summary judgment. The other issues, the way I read their amended complaint is, they may have discovery they're going to need to take on those other issues. There may be issues of that. But nevertheless, they decided to proceed on one because that may resolve the whole case just based on that one. But I didn't see any affidavits from you that really put summary judgment at issue on the other counts that they raised but didn't even argue. Well, Your Honor, we did file a motion for partial summary judgment, again, on this pollution exclusion. I mean, based on the denial of coverage we've received from Country Mutual relating to the umbrella policy, we understood, as they have acknowledged, that to be their real issue. But when you argue below, the only argument made to Judge McMillan that I can see from the record, and I read the arguments, is that it's the pollution exclusion profession and the umbrella policy. That's correct. So those weren't even argued to. That's right. And if Country Mutual, because those are their coverage defenses, and because we had asked the judge to order that they have a duty to defend or that they defend us in the underlying case, if they wanted to assert those defenses to coverage, they should have raised them at the time. They're not our coverage. Well, they're raised by their complaint. I guess that's what I'm getting at. They have raised them in their complaint for declaratory relief. But when we went in and asked the court for declaratory relief and asked the court to order a defense in the case, based on the fact that we were asking the court to do that, Country Mutual, it's our position that they should have raised those defenses at that time. They're not defenses that the court has to take up on her own. They're their defenses. I agree with that. So in any contrary ruling, we believe that the circuit court did have authority not only to deny their motion for partial summary judgment, but also had authority to grant our motion for partial summary judgment. We argued your motion for partial summary judgment. I'm sorry? There was no argument on your motion. Actually, there was. We made arguments, presented them on the same. Except as to the pollution exclusion. I mean, nobody argued the other seven defenses that they raised. That's correct. Because Country Mutual elected for some reason not to raise those defenses. They were their defenses, and they didn't raise them. Well, what rule is there in place that says they have to raise them all at the same time? Why can't they bifurcate, so to speak, those issues? Well, they can, but I'm not aware of a rule in Illinois that says the judge cannot order a defense based on the fact that they have decided to sit on those defenses and raise them at another time. There wasn't anything in the pleadings before her that precluded her from awarding a defense or from making the ruling that she did. And, in fact, any contrary ruling really would have absolved Country Mutual of its obligation to obtain a declaratory judgment of no coverage. It's their obligation to do so under Illinois law. It's not the court's obligation to preemptively raise all the issues that it thinks, and it's not our obligation to raise their coverage defenses for them. So you don't disagree that they can still pursue those defenses? They could go back and say, now let's take up the other defenses in the context of a declaratory action. I think they could, but I think that her ruling that Country Mutual is required to provide a defense in this case at this time still stands until such time as they somehow show that that ruling should be overturned or that there's another coverage defense that somehow preempts that ruling. And, Your Honor, I think that's the risk they took when they didn't assert all the defenses in their motion for partial summary judgment. And I'll just note that Judge McMillan also noted, and I think correctly, that the Country Mutual strategy here of asserting these coverage defenses in a piecemeal fashion is really essentially a violation of public policy. Because it's simply a way for an insurance company to wear down and insure, like our clients, from a financial standpoint, until they no longer can litigate this at all. What prevented you from asking for a case management order that would set time limits on when motions needed to be filed? Nothing, Your Honor. But we did have an agreement as to filing motions. We just... nothing. So I guess what I'm getting at is a trial judge in civil cases, generally a case management order is entered, and all motions are to be filed by a certain date. That's the way I do it. And then sometimes the parties will come in and ask for an extension of time. So it seems like that could be controlled by a case management order. But I didn't see anything in this case that said, you need to raise your motions by this date or they're barred. You're correct. And there was not such an order in this case. Any other questions about the procedural aspects of the case? No. Well, going back then just briefly to the issues involving the pollution exclusion, the other things I would note is that the Livestock Management Facilities Act, again, no violations asserted that that act was violated in construction and operation and siting of this particular facility. That act was adopted in 1996. The Hilltop View facility was constructed in 2006. It was clearly subject to that act. So to the extent that there are odors associated with Hilltop View, they are contemplated by that act. And the fact that the facility is subject to the act and the fact that no one has ever sited the facility under that act means that the Department of Ag, at least, is comfortable that the odors from that facility are environmental pollution. Now, Country Mutual contends that Illinois EPA following up on the complaints involving the odors from the facility somehow establishes that these odors themselves are traditional environmental pollution. And I would just note that if you follow this sort of rationale out to its logical conclusion, it means that traditional environmental pollution would be established anytime there's a citizen's complaint to Illinois EPA about anything. Just the fact that the complaint establishes something as traditional environmental pollution. Your Honor, we contend that this is not consistent with columns and there's nothing in any other Illinois insurance decisions to support the idea that a citizen's complaint is determinative of whether or not you have traditional environmental pollution. Turning to the Imperial Marble case, which was a third district case decided last year, there are some analogies between that case. It is true, and I agree with co-counsel, that there is not an air permit in our facility. But our facility is a facility that is subject to the Livestock Management Facilities Act. There's been no allegation that it's not operated in compliance with that. The Livestock Management Facilities Act does regulate odors to some degree. It establishes setback requirements for these types of facilities. And under the same reasoning employed by the third district, the odors emitted by the Hilltop View facility are not hazardous substances because they're contemplated by. And comply with the Livestock Management Facilities Act in the same manner that the air emissions from the facility in Imperial Marble were allowed under the air permit. Thank you, Your Honor. Thank you. Rebuttal? I'm going to read something here because I want to get the quote right. But the LMFA states, quote, when livestock waste is not applied in a responsible manner, it may create pollutional problems. That's cited at page six of our reply brief. It further states that odor control methods, and that's a term they use, must be practiced by operators of livestock waste handling facilities and specifically refers to manure in this regard. It identifies odor control methods as, quote, those methods identified in the Illinois Environmental Protection Act concerning agriculture-related pollution. We're relying on the LMFA to get a grasp on what is traditional environmental pollution. LMFA contemplates, it's not a license to do anything you want once you've been approved. You have to operate it responsibly. And the underlying complaint against the insurers in this case is they didn't do that. So if you compare the allegations of the complaint with the policy terms and then you factor in this traditional environmental pollution, you see that they're saying they didn't operate responsibly. When they don't operate responsibly under the LMFA, there are pollutional problems. There are agricultural-related pollution problems. The Illinois Administrative Code talks about it is hereby determined that construction, establishment, and operation, the pre-approval doesn't know what the operation is going to be like. But it goes on to say that the use of livestock wastes for agricultural purposes causes, threatens, or allows air pollution. The discharge of contaminants into the air of Illinois in sufficient quantities and of such characteristics and duration as to be injurious to human, plant, or animal life, to health or to property, or, and this is what the allegation is here, to unreasonably interfere with the enjoyment of life or property. So when we talk about what the IEPA did, the agency did, what the act did, we're trying to give an idea of what is traditional environmental pollution. We're not saying that one complaint would do it and the fact that they investigated one complaint. We cite a case in our brief, the Goodson case, where an IEPA personnel testified at a trial and said that he'd done over 300 of these and the smell. Not surprisingly, but that's the smell. There are cases, this is a case called GOTT, G-O-T-T, versus Moore Pork, M-O-R-E-P-O-R-K, Inc. It's an Illinois Pollution Control Board case, 1998, Illinois, Environmental Lexus, 152. This is a citizen's enforcement action concerning odors from a hog confinement building and they find that it's air pollution under the act. There are numerous of those cases. There's one that I was talking about before that went out to the Illinois Supreme Court that is a chicken plant. Everything is the same except it's chickens instead of hogs. And they found it was air pollution. So these complaints about odor are treated as air pollution. So if you're trying to determine whether something is traditional environmental pollution, you look at things like this. You look at the statutes. You look at whether IEPA investigates it. With respect to the seven other claims, not every claim in a lawsuit becomes right for summary judgment at the same time. Discovery is ongoing. As a matter of fact, the judge just ordered, granted a motion to compel so that more documents would be provided. Some claims are never right for summary judgment because there's a factual issue. There's no requirement to bring all of them at once. Their motion said that we were in violation, that we had breached the contract because we denied on the grounds of the pollution exclusion. And therefore, we were stopped to do anything else. It didn't say, didn't address all the merits of those claims, other claims, and there's nothing in the case management order that we do have in this case that required us to file our motions at a particular time. Those are still ongoing. We're still litigating over those now, and there's a whole bunch of other defenses in this case that make a difference. I want to make sure I got that in, so I went out of order. I'm going to go back to Columns and say we're not asking the court to, we're not saying that you should look at the dictionary definition of pollutants, which is a term in the policy. We're saying look at the definition of hazardous, which is not a term in the policy. Look at the definition of hazardous in order to determine what traditional environmental pollution means. The court didn't define it. The closest we come is this, i.e., that is hazardous materials dispersed into the environment. Thank you. Take this matter under advisement and stand at recess until 1 o'clock.